## J. S. LEWARS v. JACOB WEAVER AND WIFE.

ERROR TO THE COURT OF COMMON PLEAS OF COLUMBIA COUNTY.

Argued April 9, 1888—Decided October 1, 1888.

1. Where a cause is submitted for trial and decision to the court without a jury, under the act of April 22, 1874, P. L. 109, the decision must state the facts found as the substantial and controlling facts of the case, separately and distinctly and unmingled with the conclusions of law, otherwise it will be held to be fatally defective.

2. If, in such a submission, relevant testimony has been offered by one party and admitted without objection by the opposite party, or by the witness, it is error for the court after the case has closed on the evidence to reject the testimony upon the ground that its subject matter was a privileged communication.

3. That a notary public prepared a mortgage, and took the acknowledgment thereof and afterwards delivered it to the mortgagee, does not of itself so constitute him the agent of the mortgagee as to make the latter responsible for fraud or imposition in procuring the execution of the mortgage in his absence.

Statement of Facts.

4. When the certificate of the acknowledgment of a mortgage is impeached for falsity in its averments or fraud in procuring the execution, evidence of the acts and declarations of the participants, at the time of the execution and acknowledgment, is relevant and admissible as of the res gestæ, whether the mortgagee be present or absent.

5. If the consideration of a married woman's mortgage has passed before the mortgage is given, so that the mortgagee has not parted with his money upon the faith of the mortgage, the certificate of acknowledgment is not conclusive, as to the mortgagee, but may be impeached by parol testimony.

6. But, in any such case, the evidence, impeaching the certificate, should be of the clearest and most satisfactory character, above suspicion, consistent with itself, intrinsically probable, and so persuasive that the judicial mind can rest upon it with the conviction that the ends of justice will be subserved by giving it effect as the basis of a decree.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 150 January Term 1887, Sup. Ct.; court below, No. 88 September Term 1883, C. P.

On June 13, 1883, a scire facias sur mortgage was issued in favor of James S. Lewars, administrator of Joseph Clewell, deceased, against Jacob Weaver and Abigail Weaver, his wife, with notice to terre-tenants, to recover upon a mortgage executed by the defendants to the said deceased, dated February 13, 1878, upon real estate the property of said Abigail Weaver, to secure the sum of $500, payable February 13, 1879. The mortgagee died in 1882, and letters of administration were granted to said Lewars. The plea was, " non est factum, with leave to give the special matter in evidence."

On May 11, 1885, counsel agreed by writing filed to dispense with trial by jury and to submit the decision of the cause to the court, under the provisions of the act of April 22, 1874, P. L. 109.*

At the trial on May 20, 1885, the plaintiff put in evidence the mortgage, dated February 13, 1878, purporting to have been duly acknowledged the same day before Lewis Yetter, notary public, with a separate examination of the wife, and rested.

---

* See § 1 of said act: " The parties thereto, excepting those acting in a fiduciary capacity, may by agreement filed," etc.

Statement of Facts.

The defendants then called Charles Weaver, a son of Fayen Weaver:

Q. What was it that your grandfather said to your grandmother, about signing the paper? Objected to.

By the court: Objection overruled.[4]

Q. Did Lewis Yetter tell your grandmother what kind of paper it was? A. No, sir. Q. Did anybody? A. No, sir. Q. Did your grandmother read the paper? A. No, sir. Q. Did anybody read it to her? A. No, sir. Q. Your grandmother signed the paper after she had been asked to? A. Yes, sir. Q. Who was in the room when she signed the paper? A. All of us. Q. Was there any time while 'Squire Yetter was there that your grandfather went out of the room? A. No, sir. Q. After your grandfather and grandmother had signed the paper, what was done with it? A. Yetter put it in his pocket. Q. And then what happened? What did Yetter and your father do after that? A. They wanted them to stay for dinner, but they didn't do it, and they went right home on the next train to Catawissa. Q. Were you in the room all the time that Yetter and your father and grandfather and grandmother were there? A. Yes, sir. Q. Did you go back to school that forenoon? A. No, sir. Q. Did you ever see your father and Mr. Yetter there before or after? A. No, sir. Q. They were never there but once? A. No, sir; yes, sir; yes, they was never there but once. Q. What room was it that they were in, all you there together? A. The kitchen.

Q. Now, I ask the question, what Mr. Jacob Weaver said to Mrs. Weaver, his wife, about signing the paper? Objected to.

By the court: In the presence of Yetter?

Mr. Freeze: In the presence of Yetter; to be followed by inquiry whether what he said to her was what Yetter said to him about having her sign the paper.

Mr. Rhawn: We object, because Mr. Clewell was not there, was not present, and, generally, because it is incompetent and irrelevant.

Mr. Freeze: We think it relevant testimony in this view of it, that, whether Clewell was there or not, Yetter was there as his agent, acting for him and transacting this business; and, so far as anything that was said or done by Yetter in the transaction of it was concerned, it would be testimony as well as if Clewell himself had been there.

Statement of Facts.

By the court: Is the mortgage in the handwriting of Yetter?

Mr. Freeze : Yes, sir, in the handwriting of Yetter and witnessed by Yetter and Fayen Weaver.

Mr. Rhawn : There is no evidence that Yetter was acting as the agent of Clewell, nor would there be any inference of that fact from the evidence that the mortgage is in the handwriting of Yetter, but, on the other hand, the presumption would be a violent one that he was acting as the agent of the mortgagors, from the manner in which he went there.

By the court: We will overrule the objection and hear the evidence ; we will be able to draw our inferences after we hear it all.

Q. Now, Charles, what was it that Yetter asked your grandmother to do ? A. Why, he asked her to sign it. Q. Then what did your grandfather say to her ? A. He told her. Q. Do you remember what he said to her ? A. He told her that Yetter said she should sign the paper. Q. Did he say that in German or not ? A. German ; she can't understand any English, hardly, at all. Q. It was after that then that she signed it ? A. Yes, sir.

Other testimony of this witness is considered in the Opinion of the Court.

The defendants then put in evidence deed from Stephen Baldy and wife to Abigail Weaver, dated March 30, 1867, for the land embraced in the mortgage, and followed by calling W. L. Eyerly, one of defendants' counsel, who testified :

I knew Clewell in his lifetime, had conversation with him in relation to this mortgage debt here, did business for him. I don't recollect the day, but I recollect we talked about it. He was desirous of collecting the money ; and, if my recollection is correct, and I think it is, he told me that the amount of money owing on this was not a debt of Mrs. Weaver but of Fayen ; and then he went on to explain it ; he said that he loaned Fayen Weaver some money on promissory notes, and wanted to secure them, and had this mortgage executed to secure those notes ; told me so possibly two years before he died, on several occasions. I know that to be the fact, that Fayen Weaver was indebted to him, Clewell.[18]

The case being closed on the evidence, the plaintiff presented for instruction the following points :

1. That the evidence of Charles Weaver is not sufficient to impeach the certificate of Lewis Yetter, a notary public, show- ing the acknowledgment to be in due form of law.[19]

2. That, there being no evidence in the case that Joseph Clewell, the mortgagee, knew of the alleged fraud practiced on Abigail Weaver, one of the mortgagors, at the time the mortgage was given, judgment should be directed to be entered for the plaintiff.[20]

3. That under all the evidence in the case the plaintiff is entitled to recover.[21]

On July 10, 1885, the court, ELWELL, P. J., filed his decision, which after stating the caption of the proceeding, the plea, and the submission, proceeded:

This cause came on for trial before the president judge May 20, 1885, where the evidence herewith filed was given from which the following is found as the facts in the case : The suit is a scire facias upon a mortgage dated February 13, 1878, executed by Jacob Weaver and Abigail, his wife, upon one acre of land in Catawissa township in Columbia county, to secure the payment of five hundred dollars described as the real debt, with interest, on February 13, 1879. The scire facias was issued on June 13, 1883. It appears by mortgage book vol. 9, from the recorder's office of Columbia county, on page 620, etc., that the mortgage is there recorded purporting to have been executed and duly acknowledged by Jacob Weaver and Abigail, his wife, upon the lands, for the consideration and as security, and payable, as set forth in the scire facias ; the said mortgage having been recorded on February 16, 1878. It appears by deed of Stephen Baldy and wife to Abigail Weaver dated March 30, 1867, that she was the owner of the land described in the mortgage in her own right. It appears by the recitals in the mortgage, or rather it is recited therein, that the mortgage was given to secure the payment of a bond of the said Abigail for $1,000, bearing even date with the mortgage for real debt $500, and payable as hereinbefore stated. The certificate of the acknowledgment of the mortgage was signed by Lewis Yetter, a notary public, and certified with his official seal, and is as follows :

" Be it remembered that on the 13th day of February, 1878,

personally appeared Abigail Weaver and Jacob Weaver, her husband, who I am satisfied are the grantors mentioned in the foregoing deed or conveyance, and I having first made known the contents thereof, they acknowledged that they signed, sealed and delivered the same as their voluntary act and deed; and she, the said Abigail Weaver, wife of said Jacob Weaver, being of full age, on a private examination apart from her husband, before me acknowledged that she signed, sealed and delivered the same as her voluntary act and deed, freely without any fear, threat or compulsion of her said husband. All of which is certified. LEWIS YETTER, N. P. [OFFICIAL SEAL.]"

With the foregoing, and the admission that Joseph Clewell, the mortgagee, died before November 10, 1882, and that letters of administration were on that day granted to James Lewars, the plaintiff here, the testimony on his behalf in chief was closed. On the part of the defendants, it was shown, as before stated, that the land described in the mortgage was conveyed to Abigail Weaver in 1867. It was testified by Charles Weaver, a grandson of Jacob and Abigail Weaver, now sixteen years old, a bright, intelligent and apparently truthful young man, that he was present when the mortgage was signed and heard what passed between the parties there present, in reference to the execution of the mortgage.

In accordance with his testimony and reasonable inferences from the facts stated, it is found that the facts were as follows:

### FINDINGS OF FACT.

[On February 13, 1878, Lewis Yetter, a scrivener and notary public, was employed by Joseph Clewell to obtain a mortgage from Jacob Weaver and Abigail, his wife, on property of the wife, for the sum of five hundred dollars.] [9]

On that day, Mr. Yetter and Fayen Weaver went from Catawissa by the cars to Glen City, a distance of a few miles, to the residence of Jacob Weaver and wife. They arrived there in the forenoon. Jacob Weaver was not at home; Fayen Weaver, the son, went for him. He came, and Mr. Yetter had the papers on the table. Mr. Yetter said to Jacob Weaver that he wanted him to sign the papers, that the other papers had been lost and they wanted new ones. The papers said to have been lost were not described or men-

tioned. Jacob Weaver then signed the mortgage in question. Mrs. Weaver could not read, nor speak, nor understand English. She and her husband and the witness Charles Weaver are German. Mr. Yetter could not speak or understand the German language. He communicated with Mrs. Weaver through her husband, who could understand English and speak the German language. After Jacob Weaver had signed, the scrivener asked Mrs. Weaver to sign. She could not understand him, and then the husband and son told her in Dutch. The paper was not read to her. She asked what it was. [The transaction as detailed by the witness in reference to the signing by Abigail Weaver and what occurred before and immediately after she signed was as follows: "Mr. Yetter put the mortgage on the table. My grandfather brought pen and ink. Mr. Yetter told him to. Grandmother was standing in the room. I was standing up when they walked up to the table. I went to see what they were doing. They were talking, Yetter told grandfather to sign. Spoke more words after; just can't tell you what all. I remember what I have told. I couldn't tell just the words Yetter used. He sat down and wrote on that paper, and told grandfather that there other paper what Fayen Weaver had was lost and they was to make a new one and now he should sign this, and my grandfather wanted to know what for a paper, and they told him and then he signed it. And then Lewis Yetter told my grandmother to sign it and she couldn't understand him, and he told my grandfather to tell it. And he told her they were making a new paper, that that other paper had got lost, and she should set down and sign it. She wanted to know whether it would make her any trouble, and they told her no. She sat down and signed. Yetter told grandfather to tell grandmother it wan't any trouble, it was just like that there other paper they were talking about, and they was making a new one now that got lost; I don't know what kind of paper, then she signed it."] [12] From the time of signing the mortgage by Jacob Weaver and his wife, to the time that Lewis Yetter left the house, Jacob Weaver was all the time in the same room where Yetter, Mrs. Weaver, the witness and Fayen Weaver were. When the paper was signed, Mr. Yetter put it in his pocket and went out, and he and Fayen Weaver

took the next train for their home in Catawissa. It is found
as a fact that Lewis Yetter could not, without the agency of
an interpreter, interrogate Mrs. Weaver as to whether she ac-
knowledged that she signed, sealed and delivered the deed, as
her voluntary act and deed freely, without fear, threat or com-
pulsion of her husband. Nor could she read the acknowledg-
ment which he wrote. It appears that the husband was the
interpreter for the scrivener, as far as there was communication
between him, the scrivener, and Mrs. Weaver. All that was
said and done in respect to the signing and acknowledging of
the instrument, was said and done in the presence of the hus-
band of Mrs. Weaver. In the course of the trial, Charles
Weaver being upon the stand, counsel for the defendants pro-
posed to ask him this question: "What did Jacob Weaver
say to his wife in the presence of Yetter about her signing the
paper; to be followed by inquiry whether what Weaver said
to Abigail was what Yetter said to him about having her sign
it?" To which the counsel for the plaintiff objected because
Clewell, the mortgagee, was not present, and because it was
irrelevant and incompetent. The objection was overruled,
the evidence admitted, and at request of the counsel for the
plaintiff this bill is sealed. WM. ELWELL, P. J. [SEAL.]

In immediate reply to the question, the witness said: "Yet-
ter asked her to sign; grandfather told her what Yetter said,
that Yetter said she should sign the paper, told her in German,
she can't understand any English hardly at all; then after that
she signed." The witness also testified "that after his grand-
father signed, they wanted grandmother to sign, she wanted
to know what it was, they told her it wan't anything to hurt
anything, she should not be troubled about that, it would not
be of any account; she could not understand and. then my
father and grandfather told her in Dutch." The testimony in
full is hereto appended. Wm. L. Eyerly, Esq., one of the
counsel for the defendants, was called as a witness for the
defendants and testified as to what Joseph Clewell told him
in respect to the debt secured by the mortgage, who it was
that owed. But as Mr. Eyerly was attorney for Mr. Clewell
and transacted his business generally, and as the conversa-
tions about that matter were frequent between them, in the
office of the attorney, and as the talk was about collect-

Decision of Court below.

ing this debt, although he (the mortgagee) did not direct suit to be brought, I am of opinion that the communication was a privileged one and therefore strike out the evidence and do not consider it in rendering judgment in the case.[18]

Abigail Weaver was called by the defendants as a witness to prove that she cannot read English. Objected to by counsel for plaintiff and evidence rejected. Jacob Weaver was also called to prove what occurred at the execution of the mortgage. Witness objected to as incompetent. The court held, that as the mortgagee was dead the witness was incompetent under the act of 1869 to prove that the mortgage was not read, to prove that the wife could not read, nor that she was deceived by misrepresentations, nor that she was not examined in taking the acknowledgment separate and apart from her husband and sustained the objection. Counsel for defendants except and this bill is sealed at their request.

WM. ELWELL, P. J.    [SEAL.]

The evidence in the case is herewith filed and made part of the record.                                   WM. ELWELL, P. J.

CONCLUSIONS OF LAW.

[It does not appear by the evidence, otherwise than by the recital in the mortgage, that it was given to secure payment of a bond of Abigail bearing even date therewith, who owed the debt to Joseph Clewell, the mortgagee. Nor does it appear that the other paper that was said to be lost, the paper that Fayen Weaver had, was a mortgage which had been duly executed and acknowledged by Mrs. Weaver. In the absence of evidence that such was the fact, no presumption arises that the lost paper was a duly acknowledged mortgage of the land described in the mortgage in suit.][18] If Mrs. Weaver had signed and properly acknowledged the mortgage in suit, it would have been no defence that it was not read to her. But as she could not read English nor understand it when spoken, except very imperfectly, she was entitled to a truthful answer to her inquiry what the paper was, that she was requested to sign. The reply made to her by her husband at the instance of the scrivener in language which she understood, that it was nothing that would do her any hurt or give her any trouble, was a misrepresentation and a fraud upon her, whether so

intended or not. If it had been intended that she should fully understand the nature of the act she was requested to do, the answer most natural would have been, "This is a mortgage for five hundred dollars to Joseph Clewell on your lot." Instead of that, she is informed by those in whom she had confidence, at the request of the person who was acting in the interest of the mortgagee, in substance that the act which she was requested to do, was a mere formal matter that would not affect her interests. This being a false representation in respect to a material matter, the effect of which was to induce Mrs. Weaver to sign the paper and to mislead her to her prejudice, it vitiated the contract and operates as a defence to any action for a breach of the covenants in the deed: Kerr on Fraud and Mistake, 53. Mundorff v. Wickersham, 63 Pa. 87; Cridge v. Hare, 98 Pa. 561. A principal is chargeable with the representations of his agent, when such representations were among the inducements which led to the contract which the principal seeks to enforce: Wharton on Agency, § 158.

[Although there is no direct evidence that the mortgagee employed the scrivener who took the acknowledgment, to obtain the mortgage for him, the fact that he did so is fairly presumable from the circumstances. The conclusion is irresistible that the mortgagee informed the scrivener what amount he desired him to obtain a mortgage for, from Mrs. Weaver on her separate property. If he did not employ him to transact the business as his agent, he is nevertheless bound by what he did. He cannot reap the benefit of a contract made in his behalf, procured or induced by material misrepresentations, made by a person apparently authorized to speak and act for him in the transaction of the business. It is not important to consider whether a mortgage of a married woman, fairly obtained and duly acknowledged, given for anything but the debt of her husband, for purchase money of property, the improvement of her estate, or for necessaries for herself and family, is a valid instrument, for the reason that there is no evidence what the mortgage was given for, except that a bond of Mrs. Weaver, bearing even date with the mortgage, is recited as the consideration of the deed. The bond was void. It does not appear that she was otherwise indebted to Joseph Clewell. It does not appear that her husband was indebted,

Decision of Court below.

nor that she gave it as collateral security for any debt or undertaking of any other person; nor, in fact, for any other matter in respect to which she was competent to contract.] [13]

[No presumption arises that the mortgage was intended as a security for the performance of any contract in respect to which a married woman may bind her separate estate by a mortgage or other lien. But if any such presumption can be properly made, the mortgage is invalid, unless acknowledged in the manner provided by law. The certificate is full and sets forth all that the law requires, to wit: the examination apart from the husband, the making known of the contents and the declaration of voluntary execution and delivery. But the parol evidence shows that the contents were not made known to Mrs. Weaver, but were withheld from her; that her husband was actually present during the whole time the notary public was in the presence of the wife; that she made no such declaration in respect to her voluntarily executing and delivering the instrument, as that contained in the certificate. She could not understand him, and he did not communicate with her, except through her husband. In order to be valid, the acknowledgment of the wife must be taken out of the presence of the husband, where he cannot see or hear any indication of unwillingness on her part to execute or acknowledge the instrument, otherwise she has no opportunity to escape the coercion: McCandless v. Engle, 51 Pa. 310. When the certificate is overthrown by evidence that the examination was in the presence of the husband, that the wife was not properly informed as to the nature of the transaction, or that she was under the influence of fraud or coercion, it goes for nothing: Louden v. Blythe, 27 Pa. 22.

In the case last cited, it was held that the certificate is conclusive in favor of one who accepted it in good faith and paid his money without knowing or having any reason to suspect that it was untrue. That principle is invoked by the plaintiff here. But I am of the opinion that the case of the mortgagee is not brought within it by any evidence. It does not appear that Joseph Clewell parted with either money or property on the faith of this mortgage. If it was for a debt of the husband, he suffered nothing by receiving the mortgage, for the debt still remained against the husband. If the mortgage was

for the debt of a son of Mrs. Weaver, of which there is no competent evidence, the same remark is applicable. But we need not speculate as to any claim against Mrs. Weaver in law or equity which entitles the plaintiff to allege that Mrs. Weaver is estopped from proving the facts which defeat and annul the force and effect of the certificate. It follows from these views that both on the grounds of misrepresentation in regard to the contents of the mortgage, whereby Mrs. Weaver was induced to sign it, and because it was not acknowledged, as required by the statute to affect the estate of a married woman, the plaintiff is not entitled to recover against her or her land any part of the amount claimed to be due on the mortgage, and that judgment should be entered in her favor. Jacob Weaver having executed, acknowledged and delivered the mortgage, his estate, whatever it may be, in the land described, is bound by the lien of the mortgage, and therefore judgment must be entered against him for the sum of five hundred dollars with interest from the date of the mortgage, to wit February 13, 1878.] [14]

[And now, July 10, 1885, it is adjudged that Abigail Weaver is entitled to have judgment rendered in her favor. And it is further adjudged that the plaintiff is entitled to have judgment against Jacob Weaver for the sum of five hundred dollars and the interest added thereto from February 13, 1878, to the day of entering the judgment. And it is further ordered that if no exceptions are filed within thirty days after notice, as required by law, judgment shall be entered in accordance with this adjudication.] [16]

I decline to affirm the points presented by counsel for the plaintiff and find the facts and law as above stated.

The evidence taken on the trial to be written out, filed and made part of the record.

On July 13, 1885, the plaintiff excepted to the foregoing decision: Because the court, in said decision,

1–3. Has not stated, separately and distinctly, (1) the facts found; (2) the conclusions of law; (3) the answers to the 1st, 2d, and 3d points submitted by the plaintiff. [1 to 3]

4–6. And has not found as matter of law, (4) as requested in plaintiff's 1st point; (5) as requested in plaintiff's 2d point; (6) as requested in plaintiff's 3d point. [6 to 8]

7. And has found without any evidence as matter of fact, as in [ ] [9]

8, 9. And admitted the defendant's offer. [5] [10]

10. And, instead of finding the facts separately and distinctly in reference to the signing of the mortgage in suit by Abigail Weaver, and what occurred before and immediately after she signed, has stated only the testimony of Charles Weaver, as in [ ] [12]

11. And, under the head of Conclusions of Law, has not stated separately and distinctly the conclusions, but made a mixed statement of findings of fact and conclusions of law, and erred in such conclusions of law, as in the portions of the finding in [ ] [13]

12. And erred in the conclusions of law, embraced in [ ][14]

13. And erred in not stating, separately and distinctly, the facts found and the conclusions of law resulting therefrom, in respect to whether Joseph Clewell accepted the mortgage in suit in good faith, and paid his money without knowing or having any reason to suspect that it was procured by the supposed misrepresentation.[15]

14. And erred in entering judgment as in [ ] [16]

15. And erred in not directing judgment to be entered in favor of the plaintiff against the defendants.[17]

On December 6, 1886, all the foregoing exceptions were dismissed and it was ordered that judgment be entered in accordance with said adjudication. Judgment having been entered as directed, the plaintiff took this writ assigning as error

1–3. The overruling of plaintiff's exceptions. [1 to 3]

4, 5. The admission of defendants' offers. [4] [5]

6–8. The dismissal of plaintiff's 4th, 5th, 6th exceptions.[6 to 8]

9–17. The overruling of plaintiff's exceptions [9 to .17]

18. The striking out of the testimony of Mr. W. L. Eyerly, called by defendants, after the evidence was closed and submitted and without motion or request on part of plaintiff.[18]

19–21. The answers to the plaintiff's points.[19 to 21]

*Mr. W. H. Rhawn*, for the plaintiff in error:

1. The mode of finding is destructive of the decision. Where a jury is dispensed with and the cause submitted to

the court, under the act of April 22, 1874, P. L. 109, the facts found by the court, so far as they are material to a just decision of the cause, should be separately and distinctly found, with at least as much precision and particularity as are required in a special verdict: Harris v. Hay, 111 Pa. 564; Butterfield v. Lathrop, 71 Pa. 225; Marr v. Marr, 103 Pa. 463; Ellis v. Lane, 85 Pa. 265; Foreman v. Hosler, 94 Pa. 428. In a special verdict, if the jury should find, not the facts, but the evidence in the cause upon which such facts may be inferred, the finding is defective and the judgment will be reversed: Prentice v. Zane, 8 How. 484; Clark v. Halberstadt, 1 M. 26; Porter v. Coleman, 1 Pittsb. 252; Barnes v. Williams, 11 Wheat. 416; Seward v. Jackson, 8 Cow. 413; Chesapeake Ins. Co. v. Stark, 6 Cranch 288; Suydam v. Williamson, 3 How. 427; United States v. Jackalow, 1 Black 684; Hill v. Croll, 1 N. Y. 522; Fryer v. Roe, 12 C. B. 437; Hubbard v. Johnstone, 3 Taunt. 209; P., Ft. W. & C. R. Co. v. Evans, 53 Pa. 250; Ferguson v. Wright, 61 Pa. 262; Commonwealth v. McDowell, 86 Pa. 380; Central Bank v. Earley, 113 Pa. 480.

2. The offers of evidence, covered by the 4th and 5th specifications of error, were made to contradict the certificate of the notary as to the acknowledgment of the mortgage by the wife. The consideration of the mortgage, upon its face, was valid, and the certificate in all particulars regular. The evidence previously given did not show that the mortgage was without consideration, and it was not proposed, in connection with the offer, to show that fact, and that the mortgagee had notice of the alleged representation or misrepresentation made by the notary to the wife at the time the mortgage was given. The certificate of the acknowledgment of a deed or mortgage is a judicial act, and, in the absence of fraud or duress, conclusive as to the facts therein stated; a purchaser, bona fide and without notice of the fraud, is protected against it: Heeter v. Glasgow, 79 Pa. 79; Singer Mfg. Co. v. Rook, 84 Pa. 442. Michener v. Cavender, 38 Pa. 334, is not counter to this doctrine, for in that case, the officer who took the acknowledgment, falsely or by mistake certified to the acknowledgment of the wife in due form, when in point of fact the wife did not appear before him, nor was her name signed to the mortgage.

3. The certificate was evidence of the material facts stated

in it, and stood in the place of a witness. The only evidence offered to impeach the certificate was the uncorroborated parol testimony of Charles Weaver. The case stood, acknowledgment against oath. In considering the sufficiency of evidence in a suit at law, involving the destruction of a written instrument by reason of some equitable defence, the court is governed by equity analogies: Schrader v. Decker, 9 Pa. 14; Juniata B. A. v. Hetzel, 103 Pa. 514; Brawdy v. Brawdy, 7 Pa. 157. Were the defendants, the mortgagors, in a court of equity, asking that the mortgage in suit be set aside on the evidence of the one witness Weaver, their bill would at once be dismissed: Brawdy v. Brawdy, supra; Story's Eq. J., § 1528; Oppenheimer v. Wright, 106 Pa. 569; Phillips v. Meily, 106 Pa. 536; Campbell v. Patterson, 95 Pa. 454; Huffnagle v. Etter, 2 Pears. 350; Ott v. Oyer, 106 Pa. 16; Sower v. Weaver, 78 Pa. 447; Todd v. Campbell, 32 Pa. 250; N. & W. Br. Ry. Co. v. Swank, 105 Pa. 555; Thomas v. Loose, 114 Pa. 35. Moreover, when parol evidence is relied on to reform or set aside a written instrument, it must be clear, distinct, and entirely satisfactory: Spencer v. Colt, 89 Pa. 318. Whenever the evidence is loose, or in its texture open to doubt, relief will not be granted: Edmonds's App., 59 Pa. 222; Gillespie v. Moon, 2 Johns. Ch. 585; Morton v. Weaver, 99 Pa. 47.

4. There was not an iota of evidence to sustain the finding covered by the 9th specification, that Lewis Yetter, the scrivener and notary public was employed by Joseph Clewell to obtain the mortgage. That the court below was uncertain in respect of the employment of the notary, is shown by the statement in the decision, that "If he did not employ him to transact the business, he is nevertheless bound by what he did." But how was Yetter "apparently" authorized to act and speak for Clewell, if not employed by him.

5. The bond of a married woman given to secure the debt of her husband or of a stranger would be void, but her mortgage given for that purpose would be valid: Cridge v. Hare, 98 Pa. 564; Hagenbuch v. Phillips, 112 Pa. 288. If the mortgage is properly executed and all the forms of law are duly observed, it is valid: Jamison v. Jamison, 3 Wh. 457; Journeay v. Gibson, 56 Pa. 59; Daubert v. Eckert, 94 Pa. 257. It is now settled law in Pennsylvania that a married woman by mortgage

duly executed and acknowledged, when her husband joins therein, may bind her real estate. This she may do, whether it is to secure the payment of a debt due by herself, or by her husband, or by a stranger: Hagenbuch v. Phillips, 112 Pa. 288. There was no distinct finding of fact, what the consideration of the mortgage was, whether it was with or without consideration. The testimony of W. L. Eyerly, called by the defendants, plainly informed the court what the consideration of the mortgage was. It was admitted without objection on the part of the plaintiff. The court of its own motion struck out the testimony, after the cause was submitted, which was plain error.

*Mr. John G. Freeze*, for the defendants in error:

1. There is nothing in the act requiring any such statement as the argument of plaintiff seems to demand. The meaning is not that each fact must be separately and distinctly found; that each conclusion of law must be separately and distinctly found; or that the answers to any point submitted must be separately and distinctly made. What the act means is, that the facts found shall be stated separately and distinctly from the conclusions of law, and these latter separately and distinctly from the answers to the points submitted. These three matters shall be kept separate and distinct; but each separate and distinct fact need not be paragraphed and numbered, nor need each conclusion of law. In many cases it would be impossible, and in all unnecessary. Here the distinctions required by the act are observed; fact and law are kept separate and distinct.

2. It would be a monstrous perversion of justice to say that a man might employ an incompetent, a reckless, a dishonest or a superserviceable agent, and be allowed to repudiate what that agent had said and done in and about the business of the agency, and at the very time of the transaction of it; and at the same time receive the benefits and advantages of the same. No debt existed between these mortgagors and the mortgagee, the word mortgage was not spoken, nor did anybody hear the name Joseph Clewell, as the mortgagee or payee. If a bond was made at all, to accompany the mortgage, it has never been produced, and if made, was not made by anybody who owed a dollar to Clewell.

Opinion of the Court.

3. A party seeking to enforce a contract made by his agent, is bound by his agent's declarations made at the time, although he exceeded his authority: Caley v. Railroad Co., 80 Pa. 363. A principal is chargeable with the representations of his agent, when such representations were among the inducements which led to the contract which the principal seeks to enforce: Wharton on Agency, § 158; Fairfield S. Bank v. Chase, 72 Me. 226; Willey v. Knight, 27 Ala. 336; Wood's Practice Ev., § 54; Levick v. Brotherline, 74 Pa. 149; Sunbury F. Ins. Co. v. Humble, 100 Pa. 495. If there be any evidence, however slight, from which a jury might draw an inference favorable to the plaintiff, the case should go to a jury: Bevan v. Insurance Co., 9 W. & S. 187; Berg v. Abbott, 83 Pa. 177; Maynes v. Atwater, 88 Pa. 496.

4. Whatever may have been said in the earlier cases: Jamison v. Jamison, 3 Wh. 457; Schrader v. Decker, 9 Pa. 14; Louden v. Blythe, 27 Pa. 25, and some others, as to notice to or knowledge by the mortgagee of the circumstances attending an acknowledgment by a married woman, it was held in 1861, in Michener v. Cavender, 38 Pa. 334: "If the doctrine of notice is to be applied in this manner, no married woman's estate is safe, and the statutes that have been passed for her protection are as worthless as waste paper; for, whenever her husband goes into a conspiracy to strip her of her lands, the transaction is not likely to be attended with any circumstances of notice that are susceptible of proof." And in the last utterance of this court upon the question: "It is the duty of all persons taking from a married woman a mortgage of her separate estate, to ascertain affirmatively that she has not been deceived by any false representations of her husband as to the consideration of said mortgage:" Cridge v. Hare, 98 Pa. 561. And see Husband's Law of Married Women, §§ 62, 74; McCutcheon's App., 99 Pa. 133; Dodge v. Hollinshead, 6 Minn. 25 (80 Amer. D. 433); Bishop on M. W., §§ 370, 371; Hammit v. Bull, 8 Phila. 29; Neff v. Horner, 63 Pa. 327; Fulmer v. Seitz, 68 Pa. 237.

OPINION, MR. JUSTICE GREEN:

It was error in the learned court below to strike out the testimony of Wm. L. Eyerly. He was examined by the de-

fendants and cross-examined by the plaintiff in relation to the declarations of the deceased, and no objection whatever was made to his testimony on either side. No application was made to strike out his testimony, and the court acted of its own motion entirely in doing so. The plaintiff may have had a very good reason for desiring this testimony to remain in the case, and undoubtedly had a right to have it considered. It was his privilege to have it rejected, when it was offered, but he did not claim his privilege, and without such claim the court had no right either to reject it when offered or strike it out afterward. The eighteenth assignment of error is therefore sustained.

The evidence thus stricken out explained fully what was the consideration of the mortgage, to-wit: a debt due by Mrs. Weaver's son to the mortgagee, to secure which the mortgage was given. As this was a perfectly legitimate transaction, and as the court below appears to have laid much stress upon the fact that there was no apparent consideration for the mortgage, and strongly intimates that without such consideration the mortgage was void, the importance of the rejected testimony becomes manifest. The comments of the court upon this subject covered by the thirteenth, fourteenth and fifteenth assignments are erroneous and those assignments are sustained.

We think there was error also in holding that the scrivener who wrote the deed and took the acknowledgment was the agent of the mortgagee for those purposes. We cannot find any testimony to that effect. It is true there was evidence that the scrivener gave the mortgage to the mortgagee, but that fact was quite as consistent with his being the agent of the son of Mrs. Weaver as of the mortgagee. In point of fact it was Fayen Weaver, the defendant's son, who procured the scrivener and brought him to his mother to have the mortgage executed, and who was present at, and participated in, the execution of it. As it was given to secure his debt and thus was intended for his benefit, there is ample evidence to justify the inference that it was he who employed the scrivener and who stood in the relation of principal to the latter as agent. Clewell, the mortgagee, was not present at the execution of the mortgage, either in person or, so far as we can discover in the testimony, by any person as his representative. He was there-

fore not responsible for any fraud or imposition practiced upon Mrs. Weaver, if any such there was, at the execution of the mortgage. The learned court below held there was such fraud in not informing Mrs. Weaver as to the character of the paper she was signing, and he visited the consequences of the fraud upon the mortgagee, by holding that the scrivener was the agent of the mortgagee, who was for that reason responsible for the fraud. As we do not accept the theory of such agency, the conclusions which are based upon it must fall. We therefore sustain the ninth assignment, and so much of the thirteenth and fourteenth assignments as relates to the supposed agency of the scrivener for the mortgagee, and the consequences of that agency as there stated.

We do not sustain the fourth, fifth, tenth and eleventh assignments, because all the matters covered by them were part of the res gestæ and therefore admissible, without any regard to the presence or absence of the mortgagee or his agent.

Two matters of more importance remain to be considered. One is the legal sufficiency of the decision of the court. Several assignments of error present this subject. After a patient and careful study of the decision, we are constrained to say we think it is in serious and fatal conflict with our later cases and must therefore be set aside. There is no separate and distinct finding of facts, such as is required by our act of 1874 and held to be essential by a number of our rulings. The decision commences by stating the nature of the action, that *it appears* by the mortgage book the mortgage is there recorded, and *it appears* the mortgagor was the owner of the land described, and *it appears* by the recitals that the mortgage was given to secure payment of a bond for $500. The certificate of the acknowledgment before the notary is then copied and it is stated that with the admission as to the death of the mortgagee and grant of letters the plaintiff's testimony was closed. The decision then proceeds to state that on the part of the defendant *it was shown* that the land was conveyed to Mrs. Weaver in 1867 and *it was testified* by Charles Weaver, defendant's grandson, that he was present when the mortgage was signed and heard what passed at that time. So far, there is nothing in the decision which either is, or purports to be, a finding of any fact whatever. In the next sentence it is stated that "it

is found that the facts were as follows." Then follows a continuous narrative or statement, which commences by saying that on a certain day Lewis Yetter, a notary, was employed by Joseph Clewell to obtain a mortgage from Jacob Weaver and his wife, for $500, and that on the same day Yetter and Fayen Weaver went to Weaver's house; that Weaver was not at home, his son went for him, he came, they had the papers there, and adds what was said by some of the persons present, and then proceeds to give the testimony of Charles Weaver as to what was said and done. Without any finding of facts, the decision proceeds to say, that it is found that Yetter could not without an interpreter interrogate Mrs. Weaver as to her acknowledgment and that she could not read the acknowledgment. The decision then adds, that *it appears* that the husband was the interpreter and that all that was said and done was in the presence of the husband. It then states that a question was put on the trial as to what Jacob Weaver said to his wife about her signing the paper; that this was objected to, but the objection was overruled and exception taken, and the bill is signed and copied in the decision. It then states the reply of the witness to the question, and, without any finding, adds that "the testimony in full is hereto appended." It then rejects the testimony of Eyerly, says that Mrs. Weaver was called as a witness but objected to and rejected, and closed so far as the facts are concerned. It is almost needless to say that this is not the report of a referee, nor the finding of a court as required by our acts of assembly. There is not only no distinct and independent finding of facts, but there are no findings of fact at all.

It will not do to merely say in the report or decision that "the following are the facts found." They must be actually and distinctly and separately found, and they must be the substantial and controlling facts of the case. It is not enough that the finding may be sufficient as to some one or more of the minor facts, if deficient as to the others. Nor will it be a compliance with the statute to mingle the facts with the conclusions of law. This also is done in the present case, and it produces still more confusion. Much of what is said in that part of the decision we cannot agree to, as already stated, but if we could, we would be bound to hold the decision fatally

defective in this regard.    We said in Harris v. Hay, 111 Pa.
564 : " It is not enough that by going carefully through the
entire report we might be able to separate the referee's find-
ings from the testimony which he cites and the arguments
which he adduces in support of his views.    It is the business
of the referee to separate them."    We have held, in all the
cases, that the report or decision must contain a distinct and
separate finding of facts, and also the conclusions of law:
Marr v. Marr, 103 Pa. 463; Sweigard v. Wilson, 106 Pa. 207;
Harris v. Hay, supra; Ellis v. Lane, 85 Pa. 265; Butterfield
v. Lathrop, 71 Pa. 225; Foreman v. Hosler, 94 Pa. 418.    And
the facts must be found with at least as much fullness and
certainty, as in a special verdict.    These views require us to
sustain the first, second, twelfth, and such portions of the
thirteenth and fifteenth assignments of error as relate to this
subject.

The only remaining question is whether the testimony of
the grandson of the defendant is sufficient to overcome the
notary's certificate of acknowledgment.    At the time of the
occurrence he was a child eight years of age.    At the time of
his examination he was sixteen years old, and an intervening
period of eight years had elapsed.    Admittedly under our own
decisions, if Joseph Clewell had advanced money or parted
with any property real or personal on the faith of this mort-
gage, the certificate of acknowledgment would have been con-
clusive : Heeter v. Glasgow, 79 Pa. 79, and cases there cited ,
Oppenheimer v. Wright, 106 Pa. 569; Singer Mfg. Co. v.
Rook, 84 Pa. 442.    It must be admitted here that the weight
of the evidence is, that the consideration moving from Clewell
had passed before this mortgage was given.    The money had
been previously loaned and Clewell had taken Fayen Weaver's
note or notes for the debt which the mortgage was to secure.
Therefore, we are obliged to hold that as to Clewell the validity
of the acknowledgment might be impeached by parol testi-
mony, and if that testimony were clear, satisfactory, indubita-
ble, sufficient to move the mind of a chancellor to set aside a
written instrument on the ground of fraud, it would be our
duty to give it such effect, if the case were properly before us,
and pronounce this mortgage invalid.    But a most thorough
and careful consideration of the testimony fails to convince us

that such is our duty. We attach little or no consequence to that view of the testimony which relates to the question of fraud. We have seen that the mortgagee was not present, either in person or by his agent, at the execution of the instrument and is therefore not responsible for what was said or done by those who were present. He is to be regarded as a purchaser without notice and therefore not affected. If he gave up his notes against Fayen Weaver, in consideration of receiving the mortgage, he would be a purchaser for value and would be fully protected. The evidence does not disclose how this was, but the case is too uncertain in that respect to justify a court in overthrowing an acknowledgment of a mortgage, which is a judicial act : Heeter v. Glasgow, supra, upon such a ground and in the circumstances as here developed.

Moreover, it is not at all certain that any fraud was practiced upon the defendant. She signed the mortgage in the presence of her husband, her son, and the notary, and without objection. It is not pretended that the husband and son were ignorant of the contents of the paper, and both the proof and the inferences are that they understood it perfectly. No one of all these persons, including the defendant, has testified, or was examined, to prove that any fraud or imposition was practiced. Only a grandson, who was then a mere child of eight years, testified as to what occurred, and that was after eight years had elapsed from the time the mortgage was executed. The allegation of fraud is based upon the assertion that Mrs. Weaver was deceived as to the character of the paper she signed. The grandson testifies that Yetter could not speak German and that his grandmother could not speak or understand English, and that what was said to her was said by her husband. He gives somewhat different accounts of what was said. Thus, at first, he said : " They wanted her to sign it and she wanted to know what it was and they told her it wasn't anything to hurt anything at all; she shouldn't be troubled about it, that it wouldn't be of any account." On cross-examination he said, being asked to give the very words his grandfather used : " I couldn't tell you just how he spoke. Mr. Yetter sat down and wrote on that paper and told my grandfather that that there other paper what Fenen (Fayen ?) Weaver had was lost and now he should sign this ; and my

grandfather wanted to know what for a paper and they told him and then he signed it, and then Lewis Yetter told my grandmother to sign it and she couldn't understand him and he told my grandfather to tell it, and he told her that they was making a new paper, that that there other paper got lost and she should sign it; she wanted to know whether it would make her any trouble and they said no, and she sat down and signed it for him." This statement is substantially repeated later on with a little more particularity as to the reason for giving the mortgage, thus: " Q. Then after your grandfather told your grandmother that it was to take the place of that other paper that had been lost, your grandmother signed it? A. Yes, sir." Again: " Q. And Lewis Yetter then said through your father to her that it was to take the place of a paper that was lost ? A. Yes, sir."

It appears by this citation of the testimony that it was explained to the defendant that the paper she was about to sign was given to take the place of a paper previously given by her son but which was lost. As this was doubtless the fact, and there is nothing to impeach it, it is somewhat difficult to discover the fraud. She certainly knew she was assuming an obligation for her son and that is what the mortgage is. That the particular obligation she assumed included a pledge of her real estate, would be of more importance if she had refused to bind her land and had been told that this instrument would not have that effect, but it would be expecting rather too much of a child of eight years that he should understand the difference between a mortgage of land and a personal obligation for the payment of money, and hence we find no testimony on that subject, or showing that she was either expressly or impliedly deceived in relation to it. The assertion made by her husband that it would not make her trouble is the same that is always urged when a person is asked to become surety for another, and no doubt it was thoroughly believed by her husband when he made it. It does not appear therefore that the defendant was actually misinformed as to what the paper was, and it does appear that she did intend to assume an obligation for a debt or other obligation of her son, which of course she could lawfully do by way of mortgage.

Inadequate as such testimony is, to make out an allegation

of fraud, the case is much more deficient when viewed in another aspect. The notary, an entirely disinterested person, has certified under his hand and upon his official seal that he did, in point of fact, examine the defendant privately and apart from her husband; that he made known the contents of the instrument to her and that she acknowledged that she signed, sealed and delivered the same as her voluntary deed, without fear, threats or compulsion of her husband. If this is true, it puts an end at once to the defendant's case. Why is it not true? Only because one who was then a child of eight years says he was present all the time in the room when the parties were there, and that there was no time when his grandfather went out of the room. Yet the same witness having first testified that his father, his grandfather, his grandmother and Yetter were all at the house when he first came, and remained together till the instrument was executed, afterwards testified that these persons were not all there when he arrived but that his grandmother and Yetter were there together; that his grandfather was away at work and that his father went after him and brought him to the house and it was not until after that that the instrument was signed. He also testified that after he arrived, he went out to meet his father and grandfather, leaving Yetter and his grandmother together at the house. At the conclusion of his testimony, being again examined on this subject, he testified thus: "Q. Then your grandfather, your father, your grandmother and Lewis Yetter were at the house all together before you came from school? A. No, sir, my grandfather wasn't at the house, not before I came there. I was there before he was at the house. Q. Your father and Lewis Yetter and your grandmother were there together? A. Yes, sir. Q. Your father can talk Dutch? A. Yes, sir. Q. And you don't know what happened there while you (they) were there together before you came? A. No, sir." It will thus be seen that there was ample opportunity when the boy was not present for the notary to do what he has solemnly certified he did do, and the whole force of the boy's testimony is reduced to the merest negative, even if it could be depended upon for its accuracy and its verity. But it cannot be depended upon in either of these respects. Being asked with minuteness as to who signed the mortgage and,

amongst the rest, whether his father signed it, he said emphatically that he did not.  But he was at once confronted with his father's signature and then said he had not seen him sign it, although he had previously spoken with the greatest preciseness as to all the facts of the signing, naming the persons and describing the order of the signatures.  There were other discrepancies in his testimony, as might have been expected considering his age at the time of which he spoke, but it is not necessary to discuss or even to enumerate them.

It is doubtless true that there are cases in which it is proper for courts and juries to defeat a formal certificate of acknowledgment, but this is not one of them.  In any such case the evidence in contradiction of the facts set forth in the certificate, should be of the clearest and most satisfactory character ; it should be above suspicion ; it should of course be consistent with itself and free from contradictions, and it should be intrinsically probable.  It should be so persuasive in its character that the judicial mind can rest upon it, with the conviction that the ends of justice will be subserved by giving it effect as the basis of a decree.  In all of these respects we feel that the evidence in the present case is gravely deficient.  It is scarcely possible to imagine that a child of eight years could receive impressions, positive, definite and fixed, of an event such as this, in which he could have no interest and which he certainly could not understand.  The impressions of childhood as to matters of business detail are of the most fleeting, evanescent and imperfect character.  Surely it would be dangerous to permit important muniments of title, regular, complete and in due form upon their face, to be swept away by that kind of testimony, when a mere momentary inattention or a slight lapse of memory may fully account for the supposed omission of a formal ceremony.  Especially does this feeling prevail, when it is considered that the witness was the grandchild of the defendant, maintained, nourished, educated by her from his infancy, living with her always, and no doubt at all times the object of her constant affection and protecting care.  While the case may be one of hardship for the defendant we cannot sacrifice the interests of justice to a mere sentiment of compassion.  We feel it to be our duty to say that we cannot sustain the decision of the learned court below either in the conclusions of fact or

law which are expressed in the decision.  We sustain the sixth, seventh, eighth, sixteenth, seventeenth, nineteenth and twenty-first assignments of error.  We do not sustain the twentieth assignment, because the conclusion does not necessarily follow from the one premise stated in the point.

Judgment reversed and procedendo awarded.